Filed 3/19/25  In re Dy.B. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re DY.B. et al., Persons Coming Under the Juvenile Court Law. | B334841 (Los Angeles County Super. Ct. No. 23CCJP00133A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. M.B., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Julie Fox Blackshaw, Judge.  Affirmed.

Law Offices of Arthur J. LaCilento and Arthur J. LaCilento, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, M.B. (father) challenges the juvenile court's jurisdictional findings and disposition order removing his, at the time, ten-year-old twin sons, Dy.B. and Da.B. (collectively, the twins), from his custody and care. Father argues substantial evidence does not support the jurisdictional findings (of physical abuse, sexual abuse, and serious emotional abuse) or the removal order. He also argues the juvenile court violated his due process rights by not allowing the twins to testify at the adjudication hearing. We find no error and affirm.

## BACKGROUND

### 1. The Family

Father and the twins' mother, S.B. (mother), married in 2012. After three years of marriage, mother left father because of alleged verbal and physical abuse. Their divorce was finalized in 2017. Mother and father's divorce was far from amicable. For years, they have engaged in a highly contentious and acrimonious divorce and custody battle. In a May 2018 statement of decision, when the twins were approximately five years old, the family law court stated, "the parties have had a contentious relationship with little cooperation. Each blames the other and each has invoked law enforcement and/or the

2

Department of Children and Family Services on thin pretexts or based on unwarranted assumptions.  The parties should know that involving law enforcement to cure the parents' abysmal communication risks unintended consequences.  The parties' longstanding failure of communication is harming the boys."

When the underlying proceedings began, the twins were nine years old.  At that time, a family court order granted mother and father joint legal and joint physical custody of the twins.  The twins stayed with father every second and fourth week of the month from Thursday to Tuesday.  The twins are mother and father's only children together.  However, mother and father each have older children.  Mother has two adult children, a son E.K. and a daughter M.L.  Father has one older child, a teenaged daughter named H.B.

Prior to this case and beginning in 2016, there were several referrals regarding the family to the Los Angeles County Department of Children and Family Services (Department).  The referrals include allegations of general neglect, physical abuse, emotional abuse, and sexual abuse, all related to father.  The allegations were closed as either "unfounded" or "inconclusive."  Mother also had a previous referral to the Department regarding alleged physical abuse of her daughter in 2010.  That referral was closed as "unfounded."

2.    **Petition**

In November 2022, a referral was made to the Department alleging father sexually abused the twins.  That month, mother filed an incident report with the sheriff's department stating that in April 2022, she witnessed Dy.B. "continuously inserting his finger into his anus" while lying on his bed.  When she asked him why he was doing that, Dy.B. told her "[father] always does that

to him." Da.B. told mother he saw father put his fingers in Dy.B.'s anus and father tried to do the same to him. Mother told the officer she took Dy.B. to be examined by their pediatrician the following day. The doctor did not see signs of trauma to Dy.B.'s anus. The twins made similar statements to the officer. Da.B. also said father physically abused him on occasion.[1]

As stated in its January 2023 detention report, after investigating the claims of sexual abuse, the Department reported "the risk level was Moderate and the recommended decision was not to promote however the referral was promoted due to the children's disclosure of sexual abuse."

In January 2023, the Department filed a multicount Welfare and Institutions Code section 300 petition on behalf of the twins (petition).[2] The petition stated counts under subdivisions (a), (b), (d), and (j) of section 300. The petition alleged father had physically and sexually abused the twins. Mother was not named in the petition. At the initial hearings on the petition, the juvenile court detained the twins from father. The twins remained in mother's custody and care, and father was granted monitored visits.

In its March 2023 jurisdiction and disposition report, the Department reported the twins were "thriving in the home of mother." The Department assessed the family "as being at 'very high' risk for future abuse." In a May 2023 report, the Department summarized its findings as to the pending

---

[1] It appears no criminal charges have been filed against father.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

4

allegations.  The allegations of general neglect by father were "substantiated."  The allegations of sexual abuse and physical abuse by father were both "inconclusive."  The allegations of general neglect by mother were "inconclusive."

### 3.    Dy.B.

#### a.    Interviews with Department Social Workers

In November 2022, Dy.B. told a Department social worker he had already spoken with the courts and the police.  Dy.B. said he was "very suspicious of his father," who he believed "trie[d] to act 'big nice' so that the [twins would] forget all the negative things that he has done and report good things for him in court."  Dy.B. did not trust father because, according to Dy.B., father was "very sneaky," "very creepy," "very manipulative and he is a mastermind at trying to get things together to fit his way."

Dy.B. also said father was "gross because he has been putting two fingers" (his index and middle fingers) in Dy.B.'s anus.  Dy.B. explained father made Dy.B. remove his underwear and pants and lie down on the bed.  Then father "inserts his two fingers in his butt and will tell [Dy.B.] that he was trying to get his poop out."  Dy.B. reported father had been doing this for several years, with the last time being a few months earlier.  Dy.B. said when he told father to stop, father would "make an excuse or tell [Dy.B.] to be quiet."  Dy.B. believed father did the same thing to Da.B.

Dy.B. also revealed father used belts and his hands to whip him "on his butt and other areas of his body."  Dy.B. said father hit his arm, leaving marks or bruises.  Dy.B. also said father "spies on him" through an open door while Dy.B. is showering and changing clothes.  Dy.B. told the social worker he was not afraid of father, but was not comfortable with him at times.

5

Dy.B. was more comfortable with mother and did not want to visit with father.

In February 2023, Dy.B. spoke again with a Department social worker. Dy.B. told the social worker he was comfortable in mother's home. He denied being coached by anyone. Dy.B. reiterated that father had hit and punched him. He showed the social worker a scar on his arm that he said happened because father hit him. Dy.B. told the social worker he was scared of father and did not want to live with him. The social worker reported Dy.B. spontaneously and without any cues stated, " 'I don't understand why people don't believe what we are saying. I don't want to see my dad because he raped me!' " and then lowered his head. Dy.B. also said father hit Da.B. During her February 2023 interview with Dy.B., the social worker declined to ask him about father's alleged sexual abuse.

In June 2023, Dy.B. spoke again with a Department social worker. He said he did not want to visit father " 'because he raped me.' " He was scared father would hurt him and said he had difficulty falling asleep after visits with father. Dy.B. stated he was "open" with his therapist, who was helping him cope.

b.     Forensic Interview

In early December 2022, soon after the referral to the Department, Dy.B. sat for a forensic interview, which was video recorded. Toward the start of the interview, when the interviewer first asked Dy.B. to tell her "everything about your parents," Dy.B. responded with a sigh, leaned his head back, and asked for a break. He told the interviewer, "I always hate telling that part" and "It sounds like weird telling other people." Later during the interview, Dy.B. made a "grimacing face" and felt "disgusted" talking about what father did to him. Dy.B. said,

6

"When it comes to talking like family stuff, I never show my emotions." He said "talking to somebody about it. It's just so weird." About mid-way through his forensic interview, Dy.B. asked if he could take a break.

Dy.B. told the interviewer he thought his dad was "gay" "because he's always putting his hand in my butt hole for no apparent reason." Dy.B. said father touched his anus "at least 46 times," "maybe more," "like 48 times." Dy.B. could only remember three specific times father did this to him. Dy.B. recounted that he "kept count" of the times father did this to him by drawing a small "random picture" on the wall and floor in a corner of father's office where father would not expect to find Dy.B. Dy.B. explained, however, father repainted that wall and put in a new floor so Dy.B.'s drawings were no longer there.

Dy.B. said the first time father did this to him, he told Da.B. to go upstairs. Father then told Dy.B. to take off his shirt, shoes, pants and underwear. Dy.B. asked why, and father responded, " 'Just do it' " or " 'You have to' " so Dy.B. did. Father had his clothes on. Father told Dy.B. to lay on the couch facing down and father "put his finger in [Dy.B.'s] butt hole" and said he had to " 'dig deep' " to get "Booboo out [of his] butt." (Dy.B. explained "booboo" meant "poop.") Dy.B. specified father used two fingers, his index and middle fingers. Dy.B. said Da.B. was upstairs the first time this happened, but he snuck downstairs the second time. Dy.B. was reluctant to describe how it felt when father did this, but he noted it was "[v]ery weird" and "just as bad" as when your arm is hit with a belt. Dy.B. said his "butt hole" felt "[m]ushy" or "nasty, like weird" after father did this to him.

7

Dy.B. described the most recent time father touched him. Dy.B. said he was eight years old at the time and was laying on his bed praying. Father was sitting next to him.[3] Dy.B. knew father was going to try to touch his anus again because of the way father held his two fingers. Both he and father had clothes on, but father's fingers still touched Dy.B.'s "butt hole," hurting him. Dy.B. said, "[I]f you have clothes [the fingers] go in and out. If you don't have clothing go in and then out." Dy.B. mentioned another incident when he was dressing after a bath and father watched him and "smiled super creepy." Dy.B. told the interviewer that, other than his fingers, father did not use any other part of his body to touch Dy.B., and father never asked Dy.B. to do anything to father's body. Dy.B. said father was "nifty, shady, and sketchy," which meant "you can't trust him."

Dy.B. told the interviewer father touched Da.B. in the same way, but only one time, and Da.B. had his clothes on. Dy.B. said father tried to do it a second time to Da.B. but Da.B. jumped off the bed and looked at father "like he was crazy." That was the last time father tried to do it to Da.B. According to Dy.B., Da.B. said father had gone to anger management. Dy.B. said he tells Da.B. everything and he told him what father did to him.

Dy.B. said that, prior to the forensic interview, mother told him to " 'tell the truth,' " " '[d]on't lie, don't be scared. Just tell

---

[3] The video recordings of the twins' forensic interviews have been lost and are not included in the record on appeal. Thus, we are unable to view the video recording to understand some of Dy.B.'s descriptions of, for example, how he and father were positioned during the incidents discussed during the interview. The juvenile court, however, was able to and did view the recordings.

8

the truth.' " Dy.B. also told the interviewer that mother said father is "a very mean man," "selfish man," and "a weird bad man." Dy.B. told mother what father did to him because "I felt like I could trust her more than my dad." After he told mother, he said mother texted "the court or something" and she made a face like "Eww" and "Nasty." He felt relieved after telling mother because he "didn't have to like keep the truth anymore." When asked what father says about mother, Dy.B. said father "pretends to be nice all the time."

### c. Forensic Medical Exam

In December 2022, Dy.B. also underwent a forensic medical exam. During his exam, Dy.B. disclosed father " 'put 2 fingers in my butthole' " and " 'whoops me with a shoe, hand or belt.' " The results for the exam were "within normal limits. A normal/nonspecific examination does not rule out the possibility of child sexual abuse."

## 4. Da.B.

### a. Interviews with Department Social Workers.

In November 2022, Da.B. spoke with a Department social worker. Da.B. told the social worker " 'father is straight up mean.' " He said, "on occasion" father "whipped him with his hands and with different objects such as his belt." Da.B. said father had hit or punched his butt, his back, and his eye, resulting in a black eye. The last time father " 'beat [him] up bad' " was four or five years earlier.

Da.B. also told the social worker that "for years," father has stuck "his two fingers in his brother Dy.B.'s anus and tells him that he's getting the poop out." Da.B. explained that when father was going to do this to Dy.B., father told Da.B. to go downstairs but Da.B. "ends up spying on him to see what he is doing." Da.B.

9

said father tried to do the same thing to him one time. When that happened, Da.B. jumped away quickly and father "tried to joke it off." Da.B. also said father watched "them play in the bedroom and just will stand by the door and look oddly at them," making Da.B. "very uncomfortable."

Da.B. told the social worker father used to be an alcoholic. Da.B. explained he knew this "because he is very smart, he remembers things." The social worker noted both Da.B. and Dy.B. "spoke in a matter of fact tone and provided information and details freely."

In February 2023, Da.B. again spoke with a Department social worker. Da.B. told the social worker he was comfortable in mother's home. He denied being coached by anyone. Da.B. reiterated that father had hit and punched him. He said he used to cry about it, " 'but now I feel pissed off. I actually got used to him hitting me.' " He said father also hit and punched Dy.B. but he did not remember how many times it happened. He said mother reported the allegations of physical abuse, " 'but nothing happened.' " Da.B. told the social worker he did not want to visit or see father. He believed father was " 'weird because of the things he used to do to us.' " During her February 2023 interview with Da.B., the social worker declined to ask him about father's alleged sexual abuse.

In June 2023, Da.B. spoke again with a Department social worker. He said he did not miss father and was scared when he saw father. He felt people did not believe him because " 'we are still being asked to visit' " father. Da.B. said he could not sleep after he saw father's face.

### b.    Forensic Interview

Like Dy.B., Da.B. sat for a videorecorded forensic interview in early December 2022.[4]  Da.B. told the interviewer father "stuck his fingers up my butt hole."  Da.B. described one time father did this, it "felt like a mosquito bit my butt."  Da.B. explained father "pinched" him on his bottom under his clothes.  Another time, when he was six years old, Da.B. believed father tried to stick his fingers in Da.B.'s anus, but Da.B. questioned him and moved.  Da.B. denied father touched him with any other body parts or asked Da.B. to touch father's body.

Da.B. also described seeing father do the same to Dy.B.  Da.B. explained, "Four times Dad told me to go upstairs.  The first two times I went upstairs.  The third time I stayed downstairs.  I watched him tell Dy.B. to lay down.  He pulled down his pants, pulled down his underwear and stuck his fingers up his butt hole."  Dy.B. heard father tell Da.B. he was " 'just getting booboo out of your butt.' "  Although Da.B. was not sure how many times he saw father do this to Dy.B., Da.B. said he saw father do it two or three times.  He recalled one time it happened on the couch, another time it was father's bed, and he seemed to remember another time when it happened in Dy.B.'s bed.  He described how father held his fingers and how Dy.B. and father were positioned.  At one point, Da.B. stated father was using his fingers "like a knife stabbing somebody like this, except it went in the butt hole" and "he did it like slow, like super slowly."

---

[4] As noted in footnote 3 above, we are unable to view the video recording of Da.B.'s forensic interview and, therefore, it is difficult to understand some of Da.B.'s descriptions.

Da.B. wondered whether father raped Dy.B.  Da.B. explained he understood rape to mean when "you inappropriately touch someone besides their will and they don't like it."  Da.B. told the interviewer he knew "some things that I should not know," saying, "I know some people" and "TV."  Later he said he learned what rape was through television shows and "some people talking about it."

Da.B. stated he was five, seven, eight and nine years old when he saw these things happen to Dy.B.  Da.B. did not see father touch anyone else in these ways.  Da.B. told the interviewer he did not say anything about what father had done to him "at first" because he "didn't want to think it was that."  After he saw father do it to Dy.B., however, Da.B. believed father "must have did that to me.  Oh, crap."  He said he told mother about it because he was afraid and did not want to go back to his father's home.  He said he and Dy.B. "cried multiple times" "when we had to go back over there."  A few times Da.B. mentioned being scared of father.  He also said father spied on them, but it was not clear exactly what he meant by that.

After Da.B. told mother what father had done, mother said father was " 'weird' " and " 'super whacked.' "  According to Da.B., mother said when she and father were married, father " 'was always mean to me' " and he never bought them food.  Da.B. also explained mother said when she " 'tried to leave [father] he fractured [mother's] leg' " then father lied about it, saying mother " 'fell down the stairs.' "  Da.B. said mother told him father "went to anger management for 12 years."  Da.B. explained that mother told him to be honest for the forensic interview.  She said, " 'I need you to be honest again.  I'm so proud of you for being honest.  I need you to be honest again.' "

12

### c.    Forensic Medical Exam

In December 2022, Da.B. also underwent a forensic medical exam.  During his exam, Da.B. disclosed father's " 'fingers went to my buttcrack' " and father " 'pops me and hits me with a shoe, hand, or belt.' "  The results for the exam were "within normal limits today.  A normal/nonspecific exam does not exclude the possibility of child sexual abuse or negate the child's disclosure."

## 5.    Mother

In November 2022, mother reported the twins told her father had "been physical with them, they have had marks and bruises and [father] has been fingering them in their anus over the past few months."  Mother said she had been raising these issues for years in family court.  Mother believed the family court was "on father's side."  According to mother, the family court believed she was "making up the stories to get full custody" and "told her on multiple occasions that no one should bring up false information again or the other parent will be granted full custody."  Mother denied coaching the twins, telling them to lie, or trying to keep them away from father.  She said that, because of "the ongoing issues over the past few years," Dy.B. "has been acting out, emulating negative behavior and got suspended from school."  Mother said she took the twins to their pediatrician for an exam, which "revealed that there was no evidence."

Mother told the Department social worker there had been "severe domestic violence" between her and father in the past.  She said father was a "recovering alcoholic" and had been hospitalized twice for "psychiatric reasons."

In February 2023, mother spoke again with a Department social worker.  Mother denied coaching the twins.  She said they "are also telling the truth and are upset that they are not

believed." Mother reiterated what the twins said about father's physical and sexual abuse. She said there had been years of abuse, she repeatedly reported it to law enforcement and the family law court, but nothing was done. Mother stated she found Dy.B. putting his finger in his anus at her home one year earlier. When she asked him what he was doing, he said father did that to him while saying he was getting "the boo boo out." She said Da.B. was "very aggressive and wants to fight when he gets mad." She said Dy.B. was "more aggressive now" and cried because he did not think anyone believed him.

In a June 2023 email to a Department social worker, mother said father had mental health issues and was a pedophile. She said she was being "victimized" and no one was holding father accountable. She said Dy.B. recently woke her up in the middle of the night, said he was scared, and got into her bed. She also said Da.B. recently had "peed in the bed" and "on himself AGAIN today and had a meltdown." She reported the twins were "struggling" and "scared."

Later that same month, mother spoke with a Department social worker. She denied coaching or emotionally abusing the twins. She stated "they are triggered" when they speak with father. She said, "No parent wants their children to go through anything like this. I am not perfect. I have asked the children about their visits but that is not coaching. . . . I am just trying to protect my kids."

In June 2023, mother completed a "high conflict divorcing/separating families" on-line course. Mother also was participating in individual therapy.

Department social workers also spoke with maternal family members and one of mother's friends. The twins' half brother

14

E.K. said the twins never told him father abused them. However, he stated father "gave him 'weird vibes.' " A maternal great aunt said the twins " 'are very articulate and smart.' " She did not believe mother coached them and said mother " 'always tells her children to tell the truth.' " She believed Dy.B. was aggressive at times " 'because of what happened to him.' " She said father was not nice to and did not help mother when they were married. Maternal great aunt believed there was " 'something wrong with' " father. Mother's friend L.C., who had known mother since they were 13 years old, said mother was not coaching the twins. Ms. C. had never seen marks or bruises on the twins.

6.      **Father**

In November 2022, a Department social worker spoke with father. Father denied physically or sexually abusing the twins. Father believed mother was coaching the twins in order to get more custodial time. He also denied any history of domestic violence, substance abuse, or mental health issues. In a follow up email, father again denied harming the twins. He wrote, "My kids have done nothing wrong. They said these things because they were forced to. I would bet my life that with every fiber of my being." A few weeks later, father spoke again with the social worker. He believed mother was using and coercing the twins in a plot to defraud "him out of thousands of dollars." In February 2023, on advice of his counsel, father declined to be further interviewed by the Department.

By the end of February 2023, father had completed a parenting program focused on, among other things, conflict resolution and anger management. He was also participating in individual therapy. As of November 2023, however, father had not participated in "counseling for perpetrators." Father

15

explained he had not been charged with anything and, therefore, was " 'putting that off for as long as I can.' " Previously, in late 2021, father completed an anger and high-conflict behavioral skill training program.

Department social workers also spoke with two of father's friends. K.W., a retired police officer and current private investigator, said she had seen father interact with the twins many times and she had no concerns. She did not believe father would hurt his children. She believed mother manipulated the twins, and the allegations against father were lies. She said there was " [a]bsolutely zero chance' " father abused the twins and " 'a lot of lives are being destroyed.' " She told the social worker father disciplined the twins by talking to them, giving them a time out, or a book to read. She said father " 'is a man who would do anything for his children.' "

Dr. D.W. said father " 'adores his children,' " " 'would not do anything to hurt his children,' " and did not believe in corporal punishment. She believed mother " 'made up' " the allegations against father not only " 'to get funds and to get full custody' " of the twins but also " 'to destroy' " father. According to Dr. W., father was " 'devastated' " when he read the allegations against him. She said the twins " 'adore their father,' " were " 'not scared of their father,' " and did not " 'look sad.' " She questioned mother's mental health and believed mother needed therapy.

Father's mother declined to speak with a Department social worker, but she wrote an email stating, " 'My son is innocent and I am declining to make any statement and I am requesting not to have any further contact from your agency.' "

## 7. Karen Nakamatsu

Karen Nakamatsu is a family court services specialist. In that role, she performs child custody evaluations and mediations for the Los Angeles County Family Court. In November 2022, in connection with mother and father's family court proceedings, Ms. Nakamatsu was assigned to conduct a child custody evaluation, or a parenting plan assessment, during which the twins disclosed father put his fingers in Dy.B.'s anus and tried to do the same to Da.B. As a mandated reporter, Ms. Nakamatsu made a referral to the Department.

In connection with the parenting plan assessment, Ms. Nakamatsu testified in family court, as is customary. She testified mother and father were unable to cooperate with each other, making things, including school and after school activities, difficult for the twins. She noted mother and father had "ever-present problems" "that have historically and continue to negatively impact these boys."

She spoke with the twins, individually and jointly. She explained to them that nothing they told her would be confidential. Despite that, the twins "answered every question without hesitation, and did not mind." She said the twins were "not at all shy about sharing their feelings and their thoughts." The twins told her father used "two of his fingers to penetrate the anus of Dy.B." in order to get something out. Da.B. acted out an incident for Ms. Nakamatsu where father tried to do the same to him. Da.B. also told her he secretly watched when father did this to Dy.B. According to Ms. Nakamatsu, it was unclear when father last did this. She understood the twins to say it had not happened "for at least the last several months to a year."

Although the twins repeatedly told Ms. Nakamatsu they loved father, they also said they were afraid of him, believed he watched them dress and undress, and described him as " 'creepy.' " They became angry when talking about father and said he lied to them. Ms. Nakamatsu stated the twins told her they can be " 'sneaky,' " meaning they "spy on their parents sometimes" and listen to what mother and father say to other people. Ms. Nakamatsu believed the twins heard mother and father speak to others about their various legal proceedings. The twins told Ms. Nakamatsu they "can always tell when their parents are about to go to court again" because father is " 'fake nice' to them." She also explained the twins were very curious and told her they asked mother questions. For example, they said they asked mother about her relationship with father, and, according to the twins, mother responded, " 'When you're older, we'll talk about it.' "

Ms. Nakamatsu did not know whether the twins had been coached. However, she indicated they were consistent in what they told her, stating, "All I can say to you is that these boys repeatedly stated it in different ways individually, together, and this is what they believe." She recommended a forensic interview and full Evidence Code section 730 evaluation.

In November 2022, a Department social worker spoke with Ms. Nakamatsu. Ms. Nakamatsu recounted the allegations the twins had made against father, stating the twins "are adamant about the allegations." She told the social worker there was not sufficient evidence to take away father's visits permanently. She noted father was seeking sole physical and legal custody of the twins.

8.    **Therapists**

a.    **Valai Smith (individual therapist for the twins)**

In January 2023, the twins began seeing Valai Smith for individual therapy. Ms. Smith was not a licensed therapist. She was working as a clinical therapist and was supervised by a licensed therapist. She had a master's degree in social work.[5]

Ms. Smith reported, "As a result of their initial assessments, the boys have been diagnosed with Post Traumatic Stress Disorder, and Dy.B. with the additional diagnosis of Attention Deficit Hyperactivity Disorder." She treated each twin separately "in their own 50-minute sessions" followed by a conjoint 5-10 minute session with mother "solely to instruct her on how she can best assist and support [the twins] with their learned techniques."

In June 2023, Ms. Smith reported, "concerns remain that these youth have been traumatized." During individual sessions at the mention of father's name, the twins had "anger outbursts," shut down in silence, and cried. She said the twins have "pleaded to be exempted from" visits with father because they feared "reoccurring events." She noted the twins acted out at home and at school, including "fighting, vulgar language, intense and noticeable mood swings, and bedwetting, all indicative of abuse."

---

[5] At a July 2023, hearing, father's counsel raised the issue that Ms. Smith was not a licensed therapist and it was unknown how she was selected or whether she was working with the twins toward reunifying with father. The court was "not too troubled" by the fact Ms. Smith was not licensed as long as she was supervised by a licensed therapist. The court ordered the Department to ensure Ms. Smith "has all of the reports from this case, including the forensic interviews," and "all the information that is relevant."

Ms. Smith did not believe the twins were coached. She said, "[W]hat is being reported by them presents genuine," consistent, and "without coaching." The twins had made clear to her that they wanted "to be believed by the adults involved with their cases."

Ms. Smith also reported the twins had "made considerable progress except for their lack of desire to engage with" father. According to Ms. Smith, "[c]ontinuing any form of visit with their father would be detrimental to the mental health of the boys due to prolonged exposure to the alleged perpetrator." She believed the twins should continue with individual therapy but cautioned conjoint sessions with father could retraumatize them and cause regression in their improved behaviors. Ms. Smith opined the twins had "been exposed to traumatic events." She noted the twins "respond with high regard for their mother as their source of love, attention, security, and safety."

A couple of months later, in August 2023, Ms. Smith reported Dy.B. had made "moderate progress" toward his treatment goals and "exhibited noticeable improvement," while Da.B. had made "average progress" toward his treatment goals and "exhibited moderate improvement." In a December 2023 report, Ms. Smith stated the twins were doing well in therapy. Dy.B. exhibited "some improvement" and Da.B. had made "noticeable improvement."

### b. Scott Barella (conjoint therapist for the twins and father)

Between August and December 2023, the twins and father attended 10 remote conjoint therapy sessions with therapist Scott Barella. Mr. Barella reported the twins did not want to speak with father, called father disparaging names, often disconnected

20

from the conjoint sessions, and rejected items father sent to them and offers to attend events with him. Mr. Barella stated the twins "resented [father] for his abuse and lack of honesty about it, and did not want to be on these sessions with him." In one session, Dy.B. cried because "he was worried he was 'in trouble' for speaking to [father]." In another session, the twins stated father " 'raped' them with his fingers in their anus area multiple times. Dy.B. said it occurred 'over 30 times' and Da.B. said '2–5 times.' The boys were assertive and did not cry when recalling these details." Mr. Barella noted the twins' "demeanor became aggressive, defiant, and irritated" when father joined the conjoint sessions. Mr. Barella reported father had maintained his innocence and expressed frustration with the twins' "lack of respect for the process and [for] him."

The Department provided all case reports as well as the transcripts and video recordings of the twins' forensic interviews to Mr. Barella, which he reviewed.

### c. Chevonna Gaylor (individual therapist for father)

Father began individual therapy sessions with Chevonna Gaylor in July 2023. As of December 2023, father had met with Ms. Gaylor eight times. She stated father's treatment remained "in the preliminary stage" and "highly recommended that [he] continue individual therapy services to support his ongoing processing of underlying emotions associated with current life stressors, enhance skill building and build emotional intelligence/resilience."

### 9. Pediatrician Dr. David Berman

Dr. David Berman had been the twins' pediatrician since they were infants. In a November 2022 letter, he stated he

reviewed the twins' files from 2021 and found no documentation of sexual abuse. He said he did "not recall any allegation of sexual abuse."

## 10. Father's Experts

### a. Dr. Hy Malinek

Dr. Hy Malinek is a clinical and forensic psychologist with more than 35 years of clinical experience. He holds a doctoral degree in Clinical Psychology. Dr. Malinek presented a psychosexual evaluation and risk assessment of father. In particular, Dr. Malinek assessed father's "mental state, proclivity to engage in sexually inappropriate behavior," "sexual dangerousness," "whether he suffers from sexual deviation and whether he poses a danger to [the twins]." Dr. Malinek interviewed and tested father for five hours at his office and reviewed relevant documents from the underlying proceedings, including the video recordings of the twins' forensic interviews.

In his final report, Dr. Malinek stated, "[o]verall," the results of father's psychological testing "did not reveal any evidence of significant psychopathology." Dr. Malinek did "not believe that [father] can be diagnosed with pedophilic disorder." Dr. Malinek opined "that the risk [father] currently poses to his sons is low." According to Dr. Malinek, father did "not impress me and does not test as inherently antisocial, psychopathic or criminally oriented." Dr. Malinek noted, although father "tends to be defensive and lacks insight," he "did not reveal any evidence of noteworthy psychopathy." Father's measurements of "sexual dangerousness" were "uniformly low" and did "not designate him as sexually dangerous." In his report, Dr. Malinek noted the "allegations in this case have emerged in the context of a highly

22

contentious divorce" and there were "prior concerns about the reliability of the mother's [previous] reports."

### b. Dr. Bradley D. McAuliff

Dr. Bradley D. McAuliff is a Professor of Psychology at California State University, Northridge, with a doctorate in psychology and a law degree. He has "studied children's memory and suggestibility for more than 25 years." He prepared a report addressing, among other things, "the presence of factors in this case known to increase suggestibility." In his report, Dr. McAuliff expressed "serious concerns about the accuracy of [the twins'] allegations of inappropriate touching against their father." Based on his expertise and after reviewing relevant documentation in the underlying proceedings, he stated he found several "factors known to increase suggestibility," which "likely decreased the accuracy of Dy.B. and Da.B.'s reports." He noted it is more common to see parents coaching or influencing children to falsely accuse an innocent person in cases such as this that involve "child custody or access disputes."

### 11. Visits

Early in the underlying proceedings, father was restricted to monitored visits with the twins. From December 2022 through mid-March 2023, a professional visitation monitor, Michael Valdovinos, monitored visits between the twins and father. Mr. Valdovinos stated they had five successful visits, during which he said the twins "appeared to have fun and enjoy being with their father." In January 2023, however, he noted the twins refused to visit with father twice. Mr. Valdovinos noted mother accused him of not doing his job and had been "a little aggressive" in emails she sent to him. For example, in December 2022, mother did not agree with, and questioned the twins about, a portion of

his visitation report. Mother had many complaints about Mr. Valdovinos and said he lied.

Throughout the underlying proceedings, there were reports of the twins either resisting or refusing to attend visits with father. Sometimes father disputed that the twins did not want to visit him, stating either there were no visits scheduled at certain times, mother was alienating the twins from him and not encouraging them to visit, and the Department was disregarding the court's visitation orders.

In mid-March 2023, father had a medical procedure and could not visit with the twins for some time. In early April 2023, mother reported father had monitored visits over Zoom with the twins three times a week. One virtual visit began with Dy.B. stating, " 'Why should I face time with someone who raped me?' " and then crying. That visit lasted six minutes. During another virtual visit, the twins again "brought up the trauma," and father ended the visit after ten minutes. After those visits, the Department recommended father's visits be in a therapeutic setting.

April through December 2023, father had one visit with the twins. Despite the Department's consistent efforts and mother making the twins available, the twins continued to refuse to visit with father. A Department social worker reported the twins became angry and often cried when it was time to visit father. On one occasion, the twins "experienced an emotional breakdown" after declining to attend a visit. The Department listed close to 30 attempted but unsuccessful visits. The twins attended one in-person visit in mid-June 2023 (father's day), but only because their half sister H.B. was there and they wanted to see her. By all accounts, that visit went well. This was the

twins' last in-person visit with father.  At a mid-July 2023 hearing, the juvenile court was disappointed the twins had not been visiting father and conjoint counseling had not begun.

**12.     Amended Petition**

In June 2023, the Department filed and the juvenile court accepted an amended petition, which, in addition to the original counts, alleged two counts under subdivision (c) of section 300 (amended petition).  The two new counts alleged the twins suffered serious emotional and behavioral issues because of mother and father's highly acrimonious relationship and contentious divorce and custody dispute.

**13.     Order Declaring Twins Unavailable to Testify**

On June 21, 2023, the juvenile court addressed the twins' motion asking the court to declare the twins unavailable and excluding them from testifying or being subject to examination by counsel.  Counsel for the twins argued the twins' testimony would not have a material effect on the jurisdictional issues before the court and requiring them to testify would cause psychological trauma.  Counsel recognized "the [twins'] statements are relevant and go[ ] to the heart of this case," but nonetheless stated "the court has ample material from which it can assess the [twins'] credibility" and "[f]orcing the [twins] to testify would be traumatic."  Counsel noted "there is a marked difference between being interviewed in a closed setting by an expert who's trained to interview minors versus being interviewed by an adverse party."

In the alternative, if the juvenile court required the twins' testimony, counsel requested the twins be allowed to testify in chambers.  In support of the motion, counsel included the twins' therapist Ms. Smith's opinion on the twins' ability to testify.  Ms.

25

Smith noted the twins were "emotionally anchored to their parents, which could potentially pose as a challenge in testifying." In her opinion, the twins could be "negatively impacted emotionally and psychologically should they be required to testify against their father."

Counsel for father opposed the motion. Counsel stated there were no signs of trauma and there was no expert testimony that the twins would suffer substantial trauma if required to testify. Father's attorney noted the video recordings of the twins' forensic interviews show the twins "laughing," "smiling," "giggling," and "freely volunteering information." In any event, counsel argued safeguards, such as having the twins testify in chambers, were available. Moreover, counsel argued, it was father's due process right to cross-examine the twins, who had provided the only evidence that father had sexually abused them. Counsel emphasized the twins had been coached, their claims were false, and "the only way we can elicit it" is through their cross-examination.

Counsel for the Department submitted the matter to the court, but noted "Originally," she "was planning on calling the children so that the court can assess the[ir] veracity."

The juvenile court granted the motion. The court acknowledged father's concerns, but ultimately found "on balance, the children will be traumatized by this confrontation by the father" and that it would not "materially affect the court's ability to decide this case." The court noted it not only had the twins' statements from interviews and but also had "looked at the videotaped forensic interview." Pointing to letters from the twins' therapist Ms. Smith, the forensic interview videotapes, and the twins' consistent refusal to visit with father, the court stated, "[I]t

is uncontroverted that these children are suffering trauma already, even before they are being asked to testify." The court concluded the twins' in-court testimony was not "necessary for the court to decide their credibility in this case."

## 14. Court-appointed Expert, Dr. Nancy Kaser-Boyd

On July 17, 2023, the juvenile court appointed clinical and forensic psychologist Dr. Nancy Kaser-Boyd to conduct an Evidence Code section 730 psychological evaluation of mother, father, Dy.B., and Da.B. (730 evaluation). The court ordered Dr. Kaser-Boyd "to determine" the "Mental health" of mother, father, and the twins, and to provide her assessment of the "likelihood that Father will successfully reunify with the [twins]" and what "programs or services would be beneficial for Father to reunify with the [twins]."

Importantly, the juvenile court restricted the use of the 730 evaluation. Preceding the court's order appointing Dr. Kaser-Boyd, the court and counsel had several discussions on and off the record regarding the scope and purpose of the 730 evaluation. At one hearing, the juvenile court held "an extensive off-the-record conference on the 730 evaluation," after which the court stated for the record, "As I said earlier, the court will not be reading the 730 evaluation until after the adjudication hearing but will use it for disposition." At a January 2024 hearing, long after Dr. Kaser-Boyd had submitted her 730 evaluation but before disposition, the court reminded the parties that neither counsel for mother nor for father wanted the court to consider the 730 evaluation for purposes of adjudication. The court reiterated it would consider the 730 evaluation for purposes of disposition only.

27

Dr. Kaser-Boyd submitted her final report in October 2023. The adjudication hearing had begun two months earlier (as discussed below). Dr. Kaser-Boyd explained she individually interviewed mother, father, Dy.B., and Da.B. She viewed the videotapes of twins' forensic interviews, read father's experts' reports, and spoke with conjoint therapist Mr. Barella as well as with the twins' adult half sister M.L. She did not interview the twins "about the various allegations" because she believed they had been interviewed "too much" and she "was able to read the things they said in the past."

Dr. Kaser-Boyd tested Dy.B. and Da.B. to determine whether either of the twins had symptoms that normally result from sexual and physical abuse. She reported neither Da.B. nor Dy.B. tested "elevated on" Posttraumatic Stress Disorder, Anxiety Disorder, or Sexual Concerns. Dr. Kaser-Boyd found it significant that the medical examination results for the twins "were negative for anal penetration" and that neither of the twins tested "positive for Posttraumatic Stress Disorder or Anxiety Disorder." She stated, "This is completely inconsistent with the level of abuse that they are reporting" and "boys who are anally assaulted often have very significant psychological disturbances."

Dr. Kaser-Boyd concluded the twins had learned from others about family events they could not have otherwise known about. She believed the twins "likely acquired [this information] from their mother or their older siblings." Dr. Kaser-Boyd noted she could not " 'say that Mother purposefully has biased the minors against their father' " but it was "clear that the twins have been privy to, overheard, or heard many things about their father, perhaps also from their older siblings, that contribute to their current negative feelings." She did not believe mother

28

understood "the negative impact this creates for her children." She suggested that the juvenile court "explain to Mother that she has a role in helping her twins modulate their emotions, that she cannot discuss any of this in front of them, and that they have been harmed by their exposure to the history she has allowed them to hear."

Dr. Kaser-Boyd was particularly concerned not only with the twins' belief that father might kidnap or kill them but also their clearly stated hatred for father. She believed the twins "need to be in therapy with a more trained person, such as a person with a Ph.D. who has experience with children who have become completely alienated from the other parent." She "strongly recommend[ed]" that the Department find a therapist for the twins who is "clearly qualified to deal with alienated children."

## 15.    Adjudication and Disposition

In June and July 2023 reports, the Department noted the twins "have continued to be consistent with their disclosures of physical and sexual abuse by father." In another report, the Department listed multiple examples, reaching back to early in the parents' divorce proceedings, of mother and father's inability to cooperate and failure to abide by court rulings not to discuss the other parent or court proceedings with the twins. The Department believed the twins "have continued to be exposed to the parental conflict and have been made aware of court issues, which is detrimental to the children's emotional wellbeing."

### a.    Testimony

The adjudication hearing began on August 29, 2023, and continued for several days over the course of many months, concluding in January 2024. On the first day, father's expert Dr.

McAuliff and the twins' therapist Ms. Smith both testified. Dr. McAuliff explained his areas of expertise were "children's suggestibility and forensic interviewing" and the court found him qualified as an expert in those areas. Dr. McAuliff stated he was asked to "talk about the scientific literature on children's memory and suggestibility." He reiterated what he previously had presented in his expert report. He said he was "not here to tell the judge this child was or was not abused. But what I can say is that there are several factors that we know increased suggestibility and decreased accuracy." Dr. McAuliff believed the forensic interviews of the twins were "[f]or the most part" "done well." He was not concerned with the forensic interview but was focused on "the issues that happened before that good forensic interview."

When asked if it was his opinion that mother influenced the twins, either intentionally or unintentionally, to make false sexual abuse allegations against father, Dr. McAuliff responded, "It is." He testified, "[T]here was either coaching or suggestibility [by mother] in the sense that it is possible that mom was concerned about what she saw" when she found Dy.B. on her bed at home touching his anus. He believed mother "influenced the reporting of Dy.B. And Dy.B. influenced the reporting of his brother as well."

Ms. Smith testified she had been seeing the twins for individual therapy since January 2023. She reiterated what she had written in her reports for the court. She explained she had diagnosed the twins with posttraumatic stress disorder and Dy.B. with attention deficit hyperactivity disorder, although she did "run it by" her supervising therapist.

Ms. Smith explained how the twins described and talked about father's alleged abuse. She testified when Da.B. spoke of father's abuse, he balled his fists, his body was a little stiff, and sometimes he sat in the corner of the couch and cried. He asked "does he have to repeat this." She also testified Dy.B. reacted similarly when describing what happened to him. Dy.B. "balled his fists," "cried," and once abruptly "walked out" of the session. Their descriptions of the alleged abuse were similar to the descriptions they had given to others. Ms. Smith believed the twins "were forthcoming" with her.

On the second day of the adjudication hearing, held in September 2023, family court services specialist Ms. Nakamatsu and professional visitation monitor Mr. Valdovinos testified. Ms. Nakamatsu reiterated what she previously had testified to in family court and reported to the Department. She indicated the twins were "not comfortable with" father and said he was "mean." The twins had told her father was "creepy" when he looked at them and they did not feel like they had privacy at father's home. She testified that when the twins told her what father had done to them, "they were a little angry," "clearly upset about it," and "[o]ther times relieved." She noted the twins "wanted to know if I was going to listen to them" and "believe them when they spoke about their concerns regarding their dad." When she said she would, "they began individually and also conjointly [telling] the same story about [w]hat they had been experiencing." Based on her discussions with the twins, she did not believe they had been coached. She testified that Dy.B. had been kicked out of an elementary school because he got into a physical altercation with another student. Da.B. told her Dy.B. sometimes got very angry and acted out when frustrated.

31

Ms. Nakamatsu testified to the "constant acrimony between" mother and father. She said they had "no ability, at least at this point, to co-parent these children."

Mr. Valdovinos reiterated what he previously had reported to the court. He testified the visits he monitored between the twins and father went well and the twins appeared comfortable with father. The last visit he monitored was in March 2023.

The third and fourth days of the adjudication hearing were held in November 2023. On these days, the twins' pediatrician Dr. Berman, father's friends Dr. W. and L.S., Department social workers Hiliana Lopez and Beverly Tomlinson-German, and conjoint counselor Mr. Barella all testified. The court also received stipulated testimony from the twins' half sister H.B.

The twins' pediatrician Dr. Berman reiterated what he had reported to the Department previously. Dr. Berman further testified that, in 2016 when the twins were almost three years old, mother reported "she found [Dy.B.] putting his finger in his butt." As a result, Dr. Berman testified he examined Dy.B. carefully, noting Dy.B. had a history of constipation. Dr. Berman testified the exam was normal. Dr. Berman stated mother did not say on that occasion father was inserting his finger in Dy.B.'s anus.

Dr. Berman explained that, at the twins' annual exam in December 2022, mother mentioned allegations of sexual abuse by father had been made and reported to law enforcement and the Department. As a result, Dr. Berman performed external anal exams for both Dy.B. and Da.B. Dr. Berman testified the exams were normal and he saw no signs of abuse. Dr. Berman stated he was a mandated reporter but he did not make reports in December 2022 because mother had said reports already were

32

made. Dr. Berman testified he had never "examined or seen abuse regarding anal penetration on a minor child."

Dr. W. testified she attempted to monitor two visits between father and the twins. Those visits did not take place because the twins did not want to attend. She testified father was a loving, focused, and patient parent. She denied having safety concerns regarding father parenting his children.

L.S. testified she had been friends with father for approximately 40 years. She believed father was a "great father." She denied any safety concerns regarding father parenting his children. Ms. S. monitored one visit and attempted to monitor 12 visits between father and the twins. She said the successful visit took place on father's day 2023 and "went great." Ms. S. said half sister H.B. was present for the pick up at the sheriff's station that day and the twins "were extremely happy to see her." Ms. S. testified she asked the twins if they wanted to leave the station to spend time with father and H.B. Initially, the twins said no. Ms. S. testified the twins ultimately had lunch with father and H.B., then bought anime cards. Since that father's day visit, however, Ms. S. explained the twins adamantly refused to visit with father.

Hiliana Lopez is a Department investigator and social worker. She testified she was assigned to this case in early 2023 and authored some of the Department reports filed with the juvenile court. She testified she did not discuss the sexual abuse allegations with the twins during a February 2023 interview because they "were already interviewed by a forensic interviewer about that." She denied that she or the Department had any concerns about mother coaching the twins.

Counsel for father asked Ms. Lopez about the Department's findings that the current referrals for both sexual abuse and physical abuse were "inconclusive." Ms. Lopez stated, "I consulted with the E.R. staff that completed those investigations and those were their findings, and I reported their findings." She testified the "I.D.C. staff" informed her "that they don't typically file any counts against a parent when the finding in E.R. is inconclusive." She did not know if that was a Department "policy." Although she testified it was not her expertise, she explained her understanding of the difference between "inconclusive" and "unfounded" allegations. She stated an "inconclusive allegation is when you don't have enough evidence to go either way" and an "unfounded [allegation] is when there's no evidence for anything."

Beverly Tomlinson-German is a Department social worker. She testified she had been assigned to this case for approximately six months. She explained how she encouraged the twins to visit with father: "By attempting to transport them every Friday to the visit. Taking them aside and talking to them by myself, inquiring why they don't want to visit. Encouraging the mother to make sure she has the children ready for the weekend visits. Also, conducting facetime visits with them." She also monitored some facetime visits with the twins and father. She testified the twins did not want to talk and sometimes would hang up or walk away. She testified further that she tried every Friday to pick the twins up from their school for visits with father, but they always refused to go with her. She explained she would sit with them in the school office and try to encourage them to attend the visits. She said sometimes the twins cried, asked "when this was going to be over," called father names, or were angry with her for

34

being there. They asked her "several times, 'Why should I visit someone who has raped me.' " Ms. Tomlinson-German cried while testifying about her attempts to encourage the twins to visit and their responses to her efforts. She believed a pause in their visitation schedule with father would be in their best interest.

Mr. Barella reiterated what he had already reported. In addition, he testified the twins spoke of father's physical and sexual abuse many times during their conjoint counseling sessions. He said Da.B. spoke "matter-of-factly, as if he was reporting a regular story. He was not overly emotional. He was describing it as if it was bothersome but not traumatic." Mr. Barella noted Dy.B., however, "had much more emotion. He was more intense with his description and had more emotional reaction to the questions." Mr. Barella described the twins as "almost angry" and "condescending" when discussing the sexual abuse claims. He testified Dy.B. had "some kind of anxiety associated with his relationship with his father." Dy.B. was "nervous," "emotional," and "angry." Da.B. on the other hand, Mr. Barella testified, was "very angry. He's not anxious. He's just angry."

When asked whether there were signs mother coached the twins to say certain things about father, Mr. Barella responded, "The boys are very clear about their perspective about their father. They speak freely and consistently, and they don't reference their mother." He testified, "In general, [the twins] feel [father is] a rapist, and he's an angry man that has not treated them well in the past, and that they're fearful of him." He said

the twins described the inappropriate touching as "insertion of finger in" "their anus area."[6]

In a filed declaration, half sister H.B. said that, until recently, she had a close bond with the twins. She described times, as recently as June 2023, when she, twins, and father were together and everyone enjoyed themselves and appeared comfortable with one another. Beginning in July 2023, however, half sister explained twins did not "want to say hi to me or even hug me," which shocked and hurt her. She said "[t]hey were not themselves" and had changed. Half sister also stated she had never seen father hit, curse at, or inappropriately touch twins; and they never told her father had done any of those things to them. She said father had never beaten or inappropriately touched her.

The fifth day of the adjudication hearing was held January 11, 2024. Mother testified. Mother recounted the claims the twins had made about father abusing them. She stated she did not coach the twins or tell them to make up stories. She said she did not talk about father or the case in her home "[b]ecause the boys get really frazzled when they hear [father's name], they get upset." She said she first heard about father's alleged sexual abuse of the twins one or two years earlier. She had no

---

[6] At the end of the November 2023 hearing dates, after hearing Ms. Tomlinson-German's and Mr. Barella's testimony and discussing visitation with counsel, the juvenile court ordered a "cooling off" period during which the twins would not be required to have weekly visits with father. Instead, they would visit with father and his family during the holidays and before the next adjudication hearing date. However, conjoint counseling would continue.

recollection of either her 2016 declaration filed in family court, in which she alleged father had sexually abused Dy.B. in the same way she most recently alleged, or her 2018 declaration also filed in family court similarly alleging father had sexually abused the twins. She testified she took the twins one time to Dr. Berman to be examined for sexual abuse. According to mother, Dr. Berman "stated with a naked eye, he could not tell if there were any signs of sexual abuse. There needed to be a different type of exam."

Mother testified the twins asked a lot of questions, for example, "why doesn't anyone believe them," and "do they have to go back with [father]?" Mother said she often told the twins to speak with their therapist or others involved in the case. She explained that, after their conjoint therapy calls with Mr. Barella and father, "it's a nightmare for us in the home, because the boys are crying. They're yelling. Sometimes Dy.B. gets in a corner, and he has meltdowns. He has shaking spells, almost like seizures." Mother indicated these episodes sometimes prompted conversations about father, but normally "they never talk about him." She told the twins, "I love them," "I believe them, and I'm sorry that happened to them."

### b. Argument

On January 17, 2024, the juvenile court held the final day of the adjudication hearing and the disposition hearing. Counsel for father asked the court to dismiss the allegations as to father. Counsel argued "the only evidence against the father is from the children, which is fueled by the mother. And the mother has unfortunately in this case, weaponized these children and has used them as her ammunition and the prize . . . is to gain sole custody." Counsel argued "evidence of coaching is clear and all over the record," including instances of the twins saying or

37

knowing things they should not know and repeating the same things to their therapist, conjoint therapist, social worker, law enforcement, and forensic interviewer. Counsel also pointed to Dr. McAuliff's testimony supporting the presence of coaching, Dr. Malinek's opinion "that there is no pedophilia inclination," the lack of any medical records supporting physical or sexual abuse, the lack of criminal charges against father, the Department's finding the allegations against father were inconclusive, and the lack of a clear timeline detailing when the alleged abuse took place.

Counsel for mother, on the other hand, argued the evidence supported findings that father physically and sexually abused the twins. Although counsel acknowledged the twins could have overheard mother or father disparaging the other since the parents had "been litigating this for ten years," counsel insisted there was "zero" evidence that mother coached or told the twins what to say. Mother's counsel also acknowledged "there is a lot of acrimony" between the parents. However, he did not believe the Department had shown the required nexus between the acrimony and the emotional distress suffered by the twins. He encouraged the court to consider in the interests of justice dismissing one of the subdivision (c) emotional abuse counts.

Counsel for the twins urged the court to sustain the amended petition in its entirety. Counsel dismissed father's concerns about coaching. She stated not only that the twins were consistent, detailed, and never recanted, but also that neither Ms. Nakamatsu nor Ms. Smith were concerned about coaching. Counsel argued the twins were credible. She noted the animosity between the parents had "been going on for most of these boys' lives."

Finally, counsel for the Department also urged the court to sustain the amended petition in its entirety. Counsel did not believe the evidence supported father's theory that mother coached the twins. He believed the twins were, overall, consistent with their claims of abuse. He also noted the twins "are very perceptive" and "have been harmed and are continuing to be harmed by the acrimony between the mother and father."

### c. Findings and Orders

After hearing argument, the juvenile court sustained the amended petition as alleged. The court declared the twins dependents of the court under subdivisions (a), (b), (c), (d), and (j) of section 300.

As to the physical abuse allegations, the court based its findings on "the boys' repeated and credible statements about father's physical abuse, their anger against father, and the fact that they exhibit symptoms of trauma."

As to the sexual abuse allegations, the court found the twins' statements of sexual abuse "credible and persuasive." The court had viewed the videotaped forensic interviews and noted, "[e]ach child described the events in their own words using different vocabulary, but the events they described were the same." The court found this created "an inference of credibility," which in turn "underlies the court's conclusion that the boys were not likely coached by their mother." The court found "father's coaching accusation to be unfounded." Although the court found "a few of Dy.B.'s statements seemed a bit farfetched," such as his statement that father anally penetrated him 48 times but he only remembered three instances well, this was not determinative. The court also noted the twins had been consistent in their statements throughout the case, Ms. Smith believed the twins'

allegations were true, the twins both exhibited trauma, and they adamantly refused to visit with father since June 2023. The court found father's experts unpersuasive. Dr. McAuliff did not address the fact that the twins each submitted to a forensic interview, which did not involve suggestive questioning. Dr. Malinek did not opine father posed no risk to the twins and he did not conclude their sexual abuse allegations were untrue.

As to the emotional abuse counts, the juvenile court found "the parents' lengthy and continuing acrimony with each other has detrimentally impacted their sons physically and emotionally causing severe emotional turmoil, anxiety, acting out, anger, P.T.S.D., and bedwetting. The children continue to suffer anxiety and trauma today." The court found mother failed to protect the twins from the acrimony between her and father, stating that by allowing the twins "to overhear conversations with damaging information about their father is not protective of the children's emotional health." Thus, although the court rejected father's coaching theory, the court found mother "exploited the children's anger at their father to further alienate them." Father also had attempted to alienate the twins from mother.

As to disposition, the juvenile court removed the twins from father and placed them in mother's custody and care under Department supervision. The court ordered father to participate in parenting and co-parenting classes, sexual abuse counseling, anger management, and individual counseling. The court ordered mother to attend parenting and co-parenting classes, sex abuse awareness counseling, and individual counseling. Father's counsel objected to the twins' continued removal from him.

After discussing the matter with counsel and acknowledging Dr. Kaser-Boyd's recommendation that the twins

40

see a therapist with more expertise than Ms. Smith, especially in the area of children alienated from a parent, the court ordered the twins to continue their individual counseling with Ms. Smith. Counsel for father argued for "a more qualified" therapist to assist the twins. Counsel for the Department, mother, and the children were all amendable to maintaining the twins' current relationship with Ms. Smith, since they had formed a bond with her and switching therapists would be detrimental to them. The court did not believe it was prudent to change the twins' therapist, stating "it does appear that they have a relationship with Ms. Smith. They are beginning to expose themselves and be vulnerable with her." The court, however, ordered the twins' attorney to consult with Ms. Smith to ensure certain topics were addressed in therapy. The court also ordered the twins to continue conjoint counseling with father and continued the visitation " 'cooling off' period" it previously had ordered, stating it would address visitation at the next hearing.

**16.  Appeal and Postappeal Events**

Father appealed the juvenile court's January 17, 2024, findings and orders.

While the instant appeal was pending, the juvenile court terminated jurisdiction and issued a custody order granting mother sole physical and legal custody of the twins.[7] Father appealed those and related orders, which appeal is pending before this Court (B340713).

---

[7] On February 28, 2025, we granted the Department's request for judicial notice of these and related juvenile court orders.

DISCUSSION

## 1. Dependency Jurisdiction

It is not clear from father's briefing which jurisdictional findings he challenges on appeal. At times, he seems to challenge all jurisdictional findings as to him; other times, he seems to focus only on the sexual abuse findings against him. We assume he challenges all of the jurisdictional findings pertaining to him. Nonetheless, as did the Department in its respondent's brief, we address only the sexual abuse allegations. " 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)[8]

### a. Applicable Law

Under subdivision (d) of section 300, the juvenile court may assert dependency jurisdiction over a child when "[t]he child has

---

[8] As the Department appears to allude to in a footnote, dependency jurisdiction would remain regardless of our opinion here because mother did not appeal the sustained allegations as to her. Nonetheless, we consider the merits of father's appeal because the court's jurisdictional findings continue to adversely affect him. If we were to reverse the jurisdictional findings as to father, the juvenile court's disposition orders, including its removal order (also on appeal here), and ultimate custody order would be called into question. (See *In re D.P.* (2023) 14 Cal.5th 266, 276–277.)

been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent or guardian or a member of the child's household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse." (§ 300, subd. (d).)

Penal Code section 11165.1 defines sexual abuse to include, among other things, "[i]ntrusion by one person into the . . . anal opening of another person" and "[t]he intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of a child . . . for purposes of sexual arousal or gratification, except that it does not include acts which may reasonably be construed to be normal caretaker responsibilities; interactions with, or demonstrations of affection for, the child; or acts performed for a valid medical purpose." (Pen. Code, § 11165.1, subds. (b)(3)–(4).)

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) "The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.*, *supra*, at p. 773.) " 'The purpose of dependency proceedings is to

prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

### b.    Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid.*)  In determining whether substantial evidence exists such that a reasonable trier of fact could find the order challenged on appeal is appropriate, we review the entire record in the light most favorable to the challenged order.  (*Ibid.*)

"Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)  Substantial evidence " 'is not synonymous with any evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' " (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

44

### c. Substantial evidence supports the juvenile court's jurisdictional findings under subdivision (d).

Father purports to make five points to support his argument that substantial evidence does not support the juvenile court's jurisdictional findings. We boil his arguments down to two—the twins were not credible and past allegations of similar conduct were unfounded or inconclusive—neither of which supports reversal here.

Based on the entire record, including but not limited to videotaped forensic interviews, interviews with social workers, and sessions with therapists, the juvenile court found the twins' statements of sexual abuse "credible and persuasive." The court also found the twins "were not likely coached by their mother." The court noted the obvious trauma the twins exhibited throughout the underlying proceedings and, starting in June 2023, their consistent and adamant refusal to visit with father. The twins repeatedly stated they were scared of father. Inconsistent and unusual statements were not determinative for the court. The court had before it the previous allegations and referrals of physical and sexual abuse by father, which also were not determinative in evaluating the instant allegations. Finally, the juvenile court stated it was not persuaded by father's experts.

It is a long-settled principal of appellate practice that the reviewing court cannot reweigh the evidence, exercise independent judgment as to the facts, or substitute its credibility determinations for those of the trial court. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Issues of fact and credibility are squarely within the juvenile court's province. (*Ibid.*) Here, although the record contains evidence supporting father's position, the record

also undeniably contains evidence contrary to father's position and supporting the juvenile court's findings. Thus, despite the countervailing evidence to which father points, the juvenile court's jurisdictional findings of sexual abuse by father are supported by substantial evidence.

### d. Due Process

Father also argues the juvenile court violated his due process rights because the court did not allow the twins to testify at the adjudication hearing. Father notes the twins' credibility was a central issue below, with his position being mother coached the twins and their allegations against him were untrue. Father claims he was prejudiced by not being able to cross-examine the twins.

"A juvenile court can, consistent with a parent's due process rights, refuse to compel the testimony of a child who is otherwise available when 'the possible benefit derivable from [the] testimony would not warrant the [psychological] injury it would cause.' (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, [1085–1086] (*Jennifer J.*).)" (*In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1086 (*Daniela G.*).) The juvenile court has discretion to preclude live testimony from a child witness where "[(1)] the child's desires and wishes can be directly presented without live testimony, [(2)] where the issues to be resolved would not be materially affected by the child's testimony, and [(3)] where it is shown that the child would be psychologically damaged by being required to testify." (*Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1089.) We review a juvenile court's exclusion of a child's testimony for abuse of discretion. (*Daniela G.*, 23 Cal.App.5th at p. 1090.)

Here, the juvenile court determined that, "on balance," the twins would be traumatized by cross-examination and their testimony would not "materially affect the court's ability to decide this case." Although, as both the twins' counsel and the court recognized, the twins' statements were central to the case, the court determined it had sufficient evidence of the twins' statements that their testimony would not affect its decision on their credibility. Indeed, the court had ample evidence of the twins' statements to consider. For example, the record contained the video recorded forensic interviews, the twins' statements made during interviews with Ms. Nakamatsu and social workers, as well as statements made to law enforcement and therapists. As to whether the twins would be traumatized by testifying, the juvenile court found they would be. The determination regarding whether testifying would traumatize the twins is a factual determination that we review for substantial evidence. (*Daniela G.*, 23 Cal.App.5th at p. 1090.) The twins' therapist Ms. Smith opined the twins could be negatively impacted both emotionally and psychologically if they were required to testify against father. Additionally, the record reveals numerous times when the twins became emotional, whether sad or angry, when talking about or with father. As father points out, the record also includes evidence showing the twins being unaffected when talking about him. However, as noted above, we cannot reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) We conclude the juvenile court did not abuse its discretion in refusing to allow the twins to testify at the adjudication hearing.

In a heading in his briefs on appeal, father states *Jennifer J.*, *supra*, 8 Cal.App.4th 1080, and *Daniela G.*, *supra*, 23

Cal.App.5th 1083, are inapplicable here.  We disagree.  First, father does not mention, let alone try to distinguish *Daniela G.* in the text of his briefs.  Second, father's two-sentence attempt to distinguish *Jennifer J.* is unintelligible.  In any event, the legal principles outlined in those two cases are applicable here.

Because we affirm the juvenile court's jurisdictional findings as to father under subdivision (d) of section 300, we need not and do not address the remaining jurisdictional findings.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

## 2.    Removal

Father also argues the juvenile court erred by removing the twins from him.  To support his position, father simply claims the juvenile court never should have proceeded to disposition and again states the twins were not credible.  We already rejected father's credibility argument and affirmed jurisdictional findings.  Thus, we need not and do not address the removal order.

## DISPOSITION

The juvenile court's January 17, 2024 orders are affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

ASHMANN-GERST, J.

CHAVEZ, J.

49